# EXHIBIT A

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>17th  JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS | CASE NO.<br>18-02078-CE |
|---|---|---|

| Court address | Court telephone no. |
|---|---|
| 180 Ottawa Ave. NW, Grand Rapids, MI 49503 | (616) 632-5220 |

| Plaintiff's name(s), address(es), and telephone no(s).<br><br>Megan Johns, individually, et al. | | Defendant's name(s), address(es), and telephone no(s).<br><br>The 3M Company f/k/a Minnesota Mining &<br>Manufacturing Co. |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Sommers Schwartz, P.C.<br>Jason J. Thompson (P47184)<br>One Towne Square, 17th Floor<br>Southfield, MI 48076<br>(248) 355-0300 | v | |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. Attached is a completed case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☑ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☑ this court, ☐ _____ Court, where

it was given case number __18-02078-CE__ and assigned to Judge __George Jay Quist__ .

The action ☑ remains ☐ is no longer pending.

Summons section completed by court clerk.    | SUMMONS |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date OCT 0 8 2018 | Expiration date JAN 0 7 2019 | Court clerk  LISA POSTHUMUS LYONS |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (8/18)  **SUMMONS**                                    MCR 1.109(D), MCR 2.102(B), MCR 2.104, MCR 2.105

**PROOF OF SERVICE**

| **SUMMONS** |
|---|
| Case No.  18-02078-CE |

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:  (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that:  (notarization required) |

☐ I served personally a copy of the summons and complaint.

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,
together with _____
　　　　　　　　List all documents served with the summons and complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |
| | | | | Title |

Subscribed and sworn to before me on _____, _____ County, Michigan.
　　　　　　　　　　　　　　　　　　　　　　Date

My commission expires: _____   Signature: _____
　　　　　　　　　　　　Date　　　　　　　　　　　　　　　　Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, ~~together with~~ _____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Attachments

_____ on _____   The 3M Company f/k/a
　　　　　　　　　　　　　　　Day, date, time

_____ on behalf of  Minnesota Mining Manufacturing Co _____.
Signature

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

---

**MEGAN JOHNS**
On behalf of all others similarly situated,

**MICHAEL JOHNS**
On behalf of all others similarly situated,

**ILZE SANDRA STULTS**
On behalf of all others similarly situated,

**ADAM TROMPEN**
On behalf of all others similarly situated,

**DANIELLE GALLOWAY**
On behalf of all others similarly situated,

**JEFF STEENDAM**
On behalf of all others similarly situated,

**QUINN STEENDAM**
On behalf of all others similarly situated,

       Plaintiffs,

vs.

**WOLVERINE WORLD WIDE, INC., a
for profit corporation, and THE 3M
COMPANY f/k/a MINNESOTA MINING &
MANUFACTURING CO., a foreign
profit corporation,**

       Defendants.

CASE NO. 18-02078-CE
Hon. George J. Quist

SECOND AMENDED CLASS ACTION
COMPLAINT AND DEMAND
FOR JURY TRIAL

---

Sommers Schwartz, P.C.
Jason J. Thompson (P47184)
Attorneys for Plaintiffs
One Towne Square, 17th Floor
Southfield, MI  48076
(248) 355-0300

Berezofsky Law Group, LLC
Esther Berezofsky [*Pro Hac Vice*]
Sarah Hansel [*Pro Hac Vice*]
Attorneys for Plaintiffs
210 Lake Drive East, Ste. 101
Cherry Hill, NJ 08002
(856) 667-0500

Wexler Wallace, LLP
Edward A. Wallace [*Pro Hac Vice*]
Bryan D. Pasciak [*Pro Hac Vice*]
Kara A. Elgersma [*Pro Hac Vice*]
Attorneys for Plaintiffs
55 W. Monroe St., Ste. 3300
Chicago, IL  60603
(312) 346-2222

Pitt, McGehee, Palmer & Rivers, PC
Robert Palmer (P31704)
Megan A. Bonanni (P52079)
Jennifer L. Lord (P46912)
Attorneys for Plaintiffs
117 West 4th Street, Ste. 200
Royal Oak, MI  48067
(248) 398-9800

Motley Rice, LLC
Anne McGinness Kearse [*Pro Hac Vice*]
Thomas David Hoyle [*Pro Hac Vice*]
Fidelma L. Fitzpatrick [*Pro Hac Vice*]
Attorneys for Plaintiffs
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000

WARNER NORCROSS & JUDD LLP
James Moskal (P41885)
Janet Ramsey (P63285)
Madelaine C. Lane (P71294)
R. Michael Azzi (P74508)
Thomas A. Amon (P74508)
Attorneys for Defendant
111 Lyon, N.W., Ste. 900
Grand Rapids, MI 49503
(616) 752-2000

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Michael Johns, Megan Johns, Ilze Sandra Stults, Adam Trompen, Danielle Galloway, Jeff Steendam and Quinn Steendam (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by way of this Second Amended Class Action Complaint against Defendant Wolverine World Wide, Inc. ("Wolverine") and Defendant The 3M Company f/k/a Minnesota Mining & Manufacturing Co. ("3M") (collectively, "Defendants"), aver as follows:

## NATURE OF THE CASE

1.    Plaintiffs, individually and on behalf of class members, bring this class action lawsuit against Defendants to recover damages, and obtain other remedies, arising from the diminution of their property values and interference with the use and enjoyment of their properties. Specifically, Defendants negligently caused the release of certain chemicals including, but not limited to, per- and poly-fluoroalkyl substances ("PFAS") into the environment and at specific

1

dumping locations in Kent County, Michigan. These hazardous chemicals migrated into and contaminated Plaintiffs' and class members' private wells, which supply their homes with drinking and tap water. Only recently have some of the dump locations been uncovered and made known publicly.

2.    PFAS are a class of man-made chemicals not found naturally in the environment. PFAS include perfluorooctanic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"), the two most used and studied PFAS chemicals.[1] PFOA and PFOS are highly toxic and hazardous to both human health and the environment.

3.    EPA studies have concluded that exposure to PFOA and PFOS over certain levels can result in adverse health effects, including, but not limited to, developmental effects on fetuses exposed during pregnancy or to breastfed infants (*e.g.*, low birth weight, accelerated puberty, skeletal variations), cancer (*e.g.*, testicular, kidney), liver effects (*e.g.*, tissue damage), immune effects (*e.g.*, antibody production and immunity), gastrointestinal effects (*e.g.*, ulcerative colitis), thyroid effects and other effects (*e.g.*, cholesterol changes).

4.    In the 1940s and 1950s, Defendant 3M began creating PFAS compounds and incorporating them in its products after recognizing their surfactant properties.

5.    In the late 1950s, Wolverine, a shoe manufacturer located in Rockford, Michigan, began incorporating PFAS compounds, sourced by 3M, into its own manufacturing operations.

6.    As part of its operations, Wolverine dumped PFAS-containing waste in various locations within Kent County.

---

[1] Additional PFAS compounds detected in private wells include: PFHxS Perfluorohexane sulfonate; PFOSA Perfluorooctane sulfonamide; PFNA Perfluorononanoate; PFDeA Perfluorodecanoate; Et-PFOSA-AcOH 2-(N-ethyl-perfluorooctane sulfonamido) acetate; Me-PFOSA-AcOH 2-(N-methyl-perfluorooctane sulfonamido) acetate.

7.      Once released, and over time, the PFAS waste eventually entered the aquifers of Kent County. Once in the aquifers, the PFAS inevitably became subject to hydrogeological forces and migration throughout the area.  The ongoing PFAS migration involves an ever-expanding contamination of area water supplies, including Plaintiffs' and class members' private wells.

8.      State officials attribute the PFAS contamination in Kent County to the migration of 3M's toxic PFAS chemicals dumped by Wolverine, and, indeed, Wolverine has recently admitted to dumping these hazardous chemicals in Kent County.

9.      For decades before that, however, Defendants lied about, misrepresented, and fraudulently concealed their use and disposal of PFAS substances.

10.     By no later than the 1950s, 3M knew that the PFAS chemicals contained within Scotchgard posed substantial risks to human health and the environment.

11.     Nonetheless, 3M went to great lengths to distort the scientific community's understanding of the serious health effects posed by PFAS, funding friendly research while simultaneously paying money to ensure that less favorable research would be suppressed.  And 3M for decades failed to report to the EPA important and legally required information regarding the adverse health effects of PFAS—a failure for which it was eventually required to pay large fines.

12.     Correspondence between 3M and Wolverine confirms that Wolverine knew of the presence of PFAS in its manufacturing processes at least as early as 1998, and likely earlier.  3M advised Wolverine that Scotchgard contained PFOS, which bioaccumulates in the environment and human body.  Moreover, 3M advised Wolverine to limit human and environmental exposure to PFOS.

13.     Despite Wolverine's knowledge that PFAS was a key constituent of Scotchgard,

3

and of its toxic nature, and the inevitable migration of PFAS from its facilities to dump sites throughout Kent County and possibly beyond, Wolverine did nothing to abate, remedy, or mitigate the contamination it was creating, nor did it advise Plaintiffs or class members of the hazards to persons and property its unlawful dumping was creating.

14.    Moreover, when Wolverine's PFAS dumping first came to public light, the company falsely claimed that "[i]n fall 2016, Wolverine *first learned* that PFOS may have been present in compounds used at its former tannery in Rockford."

15.    Wolverine clearly had knowledge that Scotchgard, which it was using in its manufacturing, contained PFAS and that it was hazardous to the environment and persons.  And Wolverine concealed those facts.  Because of Defendants' fraudulent concealment, Plaintiffs and class members have only recently learned of Defendants' negligent manufacture, use, and disposal of PFAS.

16.    Plaintiffs and class members have and will continue to experience harms resulting from Defendants' negligent manufacture, use, handling, disposal, and dumping of PFAS into the environment, including interference with their property rights.

17.    The PFAS contamination has and will continue to stigmatize Plaintiffs' and class members' properties, adversely impact their property values, and impact their ability to use and enjoy their properties.

18.    For these reasons, and as set forth in detail below, Plaintiffs and class members seek relief and compensation from Defendants for the contamination of their drinking water, the interference with, and disruption of, the quality of their lives by being unable to consume or otherwise use their water, and the diminution of the values of their properties, as a result of Defendants' wrongful conduct.

## PARTIES

19.     Megan Johns is a citizen of, and adult individual residing and owning real property in, Belmont, Michigan 49306. Her well water is contaminated with PFAS chemicals.

20.     Michael Johns is a citizen of, and adult individual residing and owning real property in, Belmont, Michigan 49306. His well water is contaminated with PFAS chemicals.

21.     Ilze Sandra Stults is a citizen of, and adult individual residing and owning real property in, Belmont, Michigan 49306. Her well water is contaminated with PFAS chemicals.

22.     Adam Trompen is a citizen of, and adult individual residing and owning real property in, Cedar Springs, Michigan 49319. His well water is contaminated with PFAS chemicals.

23.     Danielle Galloway is a citizen of, and adult individual residing and owning real property in, Cedar Springs, Michigan 49319. Her well water is contaminated with PFAS chemicals.

24.     Jeff Steendam is a citizen of, and adult individual residing and owning real property in, Rockford, Michigan 49341. His well water is contaminated with PFAS chemicals.

25.     Quinn Steendam is a citizen of, and adult individual residing and owning real property in, Rockford, Michigan 49341. Her well water is contaminated with PFAS chemicals.

26.     Defendant Wolverine is a Delaware corporation with a principal place of business located at 9341 Courtland Drive NE, Rockford, Michigan 49351. Wolverine manufactures footwear and used Scotchgard, a PFAS containing product manufactured by 3M, in its manufacturing process.

27.     Defendant 3M is a Delaware corporation with a principal place of business located at 3M Center, St. Paul, Minnesota 55133. 3M manufactured Scotchgard and sold it to Wolverine

5

for use in its manufacturing processes.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over each Defendant pursuant to MCL 600.705 and MCL 600.711 because the wrongful conduct of each Defendant occurred in the State of Michigan, County of Kent.

29.     Venue is proper pursuant to MCL 600.1621(b) because the injuries occurred in Kent County, Michigan, Plaintiffs reside in Kent County, Michigan, Defendants reside or conduct business in Kent County, Michigan, and most of the occurrences described in this Complaint occurred in Kent County, Michigan.

## FACTUAL BACKGROUND

**A.      Use and disposal of toxic Scotchgard-containing products in Kent County**

30.     Defendant Wolverine was founded in Grand Rapids, Michigan in 1883 and built its first tannery in Rockford, Michigan in 1908 under the name Hirth-Krause. In 1921, Hirth-Krause and the Rockford Shoe Factory combined to become Wolverine.

31.     Wolverine invented pigskin nubuck in 1956, a new material which required chemical treatment in order to achieve the desired qualities of weather resistance and water stain repellency.

32.     Wolverine began using PFAS-containing Scotchgard in its products at its Rockford, Michigan facilities shortly after 3M put it on the market in 1958.

33.     For decades, 3M concealed the toxic nature of PFAS from the public, including Plaintiffs and class members. 3M communicated information about the potentially hazardous nature of, and risks of adverse harm to persons and property of PFAS to Wolverine by at least 1998, if not earlier.

34.     Despite this knowledge and throughout the course of its operations in Rockford, Michigan, Wolverine engaged in grossly negligent practices including the dumping and disposal of its tannery and manufacturing waste at various locations, some yet to be identified, throughout Kent County, Michigan.

35.     Upon information and belief, this waste included sludge from the manufacturing and tannery processes, chemicals, and leather and footwear scraps, all of which were contaminated with PFAS as well as additional chemicals.

36.     3M and Wolverine's negligent manufacturing, handling, and disposal of toxic PFAS resulted in the discharge of PFAS and other chemicals into Kent County's soil, which migrated into the groundwater and surface waters, and ultimately migrated into Plaintiffs' and class members' private wells and drinking water.

37.     Upon information and belief, neither Wolverine nor 3M advised the local community, or federal, state, or local authorities of the existence of the unlawfully and wrongfully dumped and disposed of toxic waste in Kent County that posed the potential to contaminate public and private drinking water sources.

38.     Defendants, and each of them, had a vested interest in concealing the contamination from Plaintiffs and class members.

39.     Defendants failed to take steps to remediate the presence of hazardous chemicals in Kent County in order to prevent their outward migration into public and private drinking water sources.

**B.     Disclosure of the PFAS contamination in Kent County**

40.     From approximately 1964 to 1978, Wolverine owned a dump site located at 1855 House Street, N.E., Plainfield Township, Michigan (the "House Street dump site"), where it

7

dumped and maintained toxic PFAS waste from its facilities.

41.     Indeed, Chris Hufnagel, Senior Vice President for Wolverine, recently explained that Wolverine's unlined House Street dump site was used to dispose of "byproducts from the company's tannery in downtown Rockford."

42.     The PFAS contamination in Kent County came to light in May 2017, when the United States Belmont Armory, less than one mile from Wolverine's House Street dump site, tested its drinking water pursuant to a National Guard Bureau internal assessment.  Despite the armory never having used PFAS, the armory's drinking water contained PFAS at an alarming amount of 96.9 ppt.

43.     The Belmont Armory immediately issued a "do not drink or cook" notice to its facility manager.

44.     Shortly thereafter, the Michigan Department of Environmental Quality ("MDEQ") identified Wolverine as the potentially responsible party for the Belmont Armory's PFAS contamination.

45.     Wolverine informed the MDEQ that it would test residential wells around its House Street dump site for PFAS, but only if the MDEQ allowed Wolverine to "have a role in the communications" residents received about the contamination.

46.     The MDEQ agreed to this arrangement, and Wolverine drafted letters to residents requesting permission to sample their wells for PFAS.  The letters failed to mention Wolverine's role in the contamination.  Moreover, Wolverine directed the MDEQ to print the letters on MDEQ letterhead and include only MDEQ as the signatory.  The MDEQ agreed.

47.     In mid-July 2017, the MDEQ reached out to approximately twenty-six homeowners in Kent County with Wolverine's ghostwritten letter requesting permission to sample their wells

8

for PFAS. Twenty-one homeowners agreed to have their wells sampled.

48.     In September 2017, after the initial group of wells tested positive for PFAS, the MDEQ and Wolverine expanded the well water sampling program to include an additional 200 wells. This additional testing area was dubbed the "buffer zone." Residential wells in this zone have tested as high as 37,800 ppt for PFOA and PFOS.

49.     In October 2017, after homes in the buffer zone tested positive for PFAS, the MDEQ and Wolverine expanded the well water sampling program again to include an additional 300 wells. This additional testing area was dubbed the "southeast expansion area."

50.     In November 2017, after homes in the southeast expansion area tested positive for PFAS, the MDEQ and Wolverine expanded the well water sampling program again to include an additional 200 wells in two separate neighborhoods. These additional testing areas were dubbed the "Jewell Avenue" and "Wolven Avenue" testing zones. The MDEQ-Wolverine PFAS testing zones continue to expand, as the sampling continues to find PFAS-contaminated wells in each new zone added.

51.     For example, Wolverine's facilities were located adjacent to the Rogue River, near Rum Creek, a tributary and part of the Rogue River watershed. Recent tests of sediments from the Rogue River and Rum Creek revealed PFOS levels up to 12,400 ppt.

52.     Monitoring wells at Wolverine's tannery site have detected PFAS levels at 490,000 ppt, 7,000 times higher than the EPA's Lifetime HAL for PFAS chemicals.

53.     As of February 8, 2018, the PFAS testing zones had expanded to cover approximately fifteen contiguous square miles within Kent County, as depicted by the map on the following page, released by local news media.



Source: Michigan DEQ                                    *Info as of Feb. 8. 2018

54.    The Kent County PFAS contamination is not necessarily limited to those areas identified above.  Over 90 sites throughout Kent County are or have been investigated by the MDEQ as Wolverine PFAS dump sites—many in which Wolverine's dumping was confirmed—

including sites on and around Plaintiffs' and class members' properties.

### C.     The Toxic impact of PFAS on Human Health and the Environment

55.     PFOA and PFOS are part of a class of man-made chemicals known as PFAS and are not found naturally in the environment.

56.     Due to their chemical structure, PFOA and PFOS are biologically and chemically stable in the environment and resistant to environmental degradation processes and thus remain present in the environment long after they are initially discharged.

57.     Because of their persistence and ability to easily migrate from soil to ground and surface water, PFAS chemicals can contaminate entire water systems causing serious environmental and health issues.

58.     PFAS chemicals bioaccumulate in living organisms, primarily in the blood serum, kidney, and liver, and remain in the human body.

59.     PFAS exposure is associated with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, pancreatic cancer, ovarian cancer, non-Hodgkin's lymphoma, thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis and pregnancy-induced hypertension, among other health issues.

60.     The C8 Health Project—a study relating to PFOA contamination from a DuPont chemical plant—was conducted to report on the health effects of elevated PFOA in the human body arising from exposures like those of Plaintiffs and class members.

61.     From 2005 to 2013, the C8 Science Panel carried out exposure and health studies in affected Mid-Ohio Valley communities and concluded that there was a "probable link" between PFOA exposure and testicular cancer, kidney cancer, thyroid disease, ulcerative colitis, high cholesterol and pregnancy-induced hypertension.

62.     In May 2006, the EPA Science Advisory Board stated that PFOA cancer data is consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans."

63.     In 2016, a peer-review panel of scientists, including epidemiologists, toxicologists and microbiologists, agreed with the U.S. Department of Health & Human Services National Toxicology Program's finding that PFOS and PFOA can harm the human immune system.

64.     The health conditions set forth above can arise months or years after PFOA-PFOS exposure.

65.     In 2012, PFOS and PFOA were included by the EPA in its Third Unregulated Contaminant Monitoring Rule.  The Unregulated Contaminant Monitoring Rule is a mechanism prescribed under the 1996 Safe Drinking Water Act that requires the EPA to issue a new list of no more than thirty unregulated contaminants to be monitored by public water systems every five years.

66.     In May 2016, the EPA established Lifetime Health Advisories for both PFOA and PFOS.  The Lifetime Health Advisories for these chemicals recommend that PFOA and PFOS should not exceed a combined concentration of 70 ppt in drinking water.  Michigan has now adopted this limit as an enforceable State standard.

67.     Individual states have set levels significantly lower than 70 ppt for these chemicals.

68.     New Jersey has adopted a maximum contaminant level of 14 ppt for PFOA in drinking water.

69.     Vermont has set a level of 20 ppt for a combined PFOA and PFOS concentration in drinking water.

70.     Health officials in Minnesota have advised cities to adopt a maximum contaminant

12

level of 35 ppt for PFOA in drinking water and 27 ppt for PFOS in drinking water.

71.     In 2015, the United States Department of Health and Human Services Agency for

Toxic Substances and Disease Registry (ATSDR) set a Minimum Risk Level (MRL) of 2x10-5

mg/kg/day for PFOA and 3x10-5 mg/kg/day for PFOS.  An MRL is an estimate of the amount of

a chemical a person can eat, drink, or breathe each day without a detectable risk to health.

72.     In June 2018, the ATSDR issued a draft Toxicological Profile for Perfluoroalkyls

which recommends reducing the MRL for PFOA to 3x10-6 mg/kg/day (a decrease by a factor of

6.7) and the MRL for PFOS to 2 x10-6 mg/kg/day (a decrease by a factor of 15).

**D.     3M's Fraudulent Concealment of the Toxic Nature of PFAS**

73.     Defendant 3M was founded in 1902 as the Minnesota Mining & Manufacturing

Company.  It merged under the name 3M Company in 2002 and manufactures a broad array of

chemical products for residential and commercial use.

74.     3M began researching PFAS chemicals in the 1940s and began commercial

production of PFAS in the early 1950s.

75.     3M used PFAS to manufacture consumer, commercial and industrial products,

including stain repellants such as Scotchgard, fire retardants, and other products.

76.     3M began marketing and selling PFAS-containing Scotchgard in 1956.

77.     As detailed below, by the early 1960s, 3M knew that PFAS had toxic effects on

living organisms, and that PFAS from industrial disposal sites would likely pollute domestic wells.

By the 1970s, 3M knew that PFAS bioaccumulates in the human body.

78.     Notwithstanding this knowledge, 3M repeatedly and affirmatively concealed the

harmful nature of PFAS by misleading the scientific community, regulators, and the public about

PFAS's harmful effects, thus fraudulently concealing the existence of Plaintiffs' and class

13

members' claims, as well as 3M's liability for same.

79.     In the early 2000s, the EPA put significant pressure on 3M to phase out PFAS use.

80.     3M caved to the EPA's pressure and phased-out use of PFAS by the mid-2000s.

81.     For 3M's failure to disclose the harmful effects of PFAS, the EPA ultimately fined the company $1.5 million.

82.     3M's fraudulent concealment, however, did not end.  After 3M phased out PFAS, it went to great lengths to ensure it commanded the science concerning these chemicals.  3M called such scientific papers and studies "defensive barriers to litigation."

83.     As further discussed *infra* at Section D (3), these defensive barriers were created, *inter alia*, through selective funding of outside research and a relationship with Dr. John Giesy, a zoology professor at Michigan State University.

### 1.     *3M Knew By the 1950s – at the latest – That PFAS Are Harmful to Human Health and Could Reach Domestic Wells Near Disposal Sites.*

84.     3M's PFAS toxicity research began in 1950 and confirmed the toxic effects of PFAS.

85.     Throughout the 1950s, 3M's animal studies consistently concluded that PFAS, including PFOS and PFOA, are "toxic."

86.     A study published in 1961 found that PFAS induced a range of toxic effects, including anesthesia, depression,   inhibition of enzymes, metabolic effects, and effects on blood pressure and the sympathetic  nervous system.

87.     In the 1970s, 3M undertook additional PFAS toxicity studies, which demonstrated that PFAS were even more toxic than was previously believed.

14

88.     Internal 3M documents from the early 1960s confirm that 3M understood that groundwater near waste disposal sites would be contaminated with PFAS.

89.     For example, an internal 3M memo from 1960 recognized that pollutants from industrial wastes dumped at one 3M disposal site "will eventually reach the water table and pollute domestic wells."

90.     In the early 1960s, testing of the groundwater underneath 3M disposal sites confirmed that they in fact had been contaminated.

91.     A 1978 study by 3M on PFOS and PFOA found that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

### 2.  *3M Knew By the 1970s – at the latest – That PFAS Was Widely Present in Human Blood and that PFAS Bioaccumulates in the Human Body*

92.     3M has publicly claimed that it phased out the production of PFAS after it first learned – in 1997 – that these chemicals were widely present in the blood of humans.

93.     However, internal 3M documents show that 3M knew its PFAS were present in the blood of human beings since at least the 1970s.

94.     In 1973, research into the accumulation of PFAS by the Children's Hospital Research Foundation, using 3M's PFAS, concluded that certain PFAS collected in the liver, where the compounds  remained for life.

95.     In 1975, two academic researchers contacted 3M regarding their finding of organic fluorine in blood from blood banks around the country and their belief that 3M's Scotchgard product may have been the source.

96.     According to internal documents, 3M responded to these researchers by "plead[ing] ignorance," and advising the scientists "not to speculate" about whether Scotchgard was the source of the PFAS.

15

97.     In 1976, 3M began monitoring the blood of its employees for PFAS.

98.     The early blood samples of 3M employees showed high levels of PFAS in the workers' blood, at 1,000 times normal levels.

99.     According to internal documents, 3M continued monitoring the blood of its employees for PFAS for approximately a decade because the company was "serious[ly] concern[ed]" that PFAS levels in 3M employees were not decreasing and, in some instances, were increasing.

100.    3M's testing of employee blood samples confirmed that PFAS bioaccumulates and remains in the human body for long periods of time.

101.    According to internal documents, by 1977 3M had confirmed that one of its PFAS— PFOS—was the "major OF [organic fluorine] compound" found in human blood nationwide.

102.    The bioaccumulation of PFAS in the human body is significant, as recognized in 1979 by a 3M scientist who noted that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

103.    3M recognized that if the public and regulators became aware of the risks associated with PFAS, it would be forced to halt its  manufacturing of PFAS and PFAS-containing products— resulting in the loss of hundreds of millions of dollars in annual revenue.

104.    Therefore, instead of disclosing the harmful effects of PFAS to the government and the public, 3M affirmatively misled the scientific community, regulators, and the public about PFAS's harmful effects, as detailed below.

### 3. *3M Suppressed Scientific Research Into The Harmful Effects of PFAS.*

105.    3M engaged in an intentional, long term and persistent effort to conceal what it knew about the harmful effects of PFAS.

16

106.   As part of the effort, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

107.   According to internal documents, 3M affirmatively mounted "defensive barriers to litigation" by "[c]ommand[ing] the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS.

108.   As part of this effort, 3M provided selective funding for outside research through 3M grant money.

109.   In exchange for providing this grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

110.   Indeed, in internal meeting minutes from 1999, 3M states that "all publications [relating to PFAS] will be reviewed by [3M's] core team and [3M executive] L. Wendling for approval."

111.   As part of this effort, 3M paid Professor John Giesy, an editor of academic journals, millions of dollars to ensure that the harmful effects of PFAS were downplayed in or removed entirely from scientific research.

112.   According to internal documents, 3M retained Professor Giesy, in part, to "attend meetings and develop joint [PFAS] projects with Chinese colleagues from whom he can obtain information and over whom he can exert some influence . . . ."

113.   In this capacity, 3M noted that Professor Giesy would need to "buy favors" from scientists in the field.

114.   In an email to 3M, Professor Giesy explained that through his position as an editor of academic journals, he reviewed "about half of the papers published in the area" of PFAS

17

ecotoxicology.

115.    Professor Giesy routinely forwarded confidential manuscripts on PFAS to 3M and rejected at least one article that included negative information on the harmful effects of PFAS on humans.

116.    As Professor Giesy explained in an email to 3M, his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

117.    While working to "review" papers for 3M, Professor Giesy explained that in his time sheets he "always listed these reviews as literature searches so that there was no paper trail to 3M."

### 4.    3M Intentionally Concealed and Destroyed Internal PFAS Documents.

118.    According to internal documents, 3M also instructed its own employees to avoid creating PFAS-related paper trails.  3M told employees working on the PFAS/fluorochemical project not to write down thoughts or have email discussions because of how those statements could be viewed in the legal discovery process.

119.    If documents relating to PFAS were created, employees were instructed to destroy those documents, including but not limited to electronic data concerning PFAS, meeting minutes from 3M's oversight committees relating to PFAS, and talking points related to 3M's ultimate decision to phase-out PFAS chemicals.

120.    Finally, a former 3M scientist and a 3M Medical Director have both publicly stated that they were directed to stamp "attorney-client privilege" on anything they wrote down about PFAS, whether it was actually privileged or not, to avoid the discovery of those documents during litigation.

121.    Through its lies and obfuscations, 3M fraudulently concealed the existence of Plaintiffs'

18

and class members' claims, and 3M's liability for same.

### 5. *3M was Fined for Withholding Critical PFAS Health Data, and Finally Phased-Out PFAS.*

122.   In 2000, 3M finally informed the EPA that PFAS chemicals are persistent in the environment, have a strong tendency to accumulate in human and animal tissues and can potentially pose a risk to human health and the environment over the long term.

123.   The EPA recommended that 3M discontinue manufacture and use of PFAS to protect human health and the environment.

124.   On May 16, 2000, after significant pressure from the EPA, 3M announced that it would phase out PFAS by the end of 2002 because of concerns over what 3M misleadingly claimed was "new information" that the chemical could contaminate the environment and impact human health.

125.   The announcement that 3M would phase out PFAS over the next two years contained false and misleading claims that, "[w]hile this chemistry has been used effectively for more than 40 years and our products are safe, our decision to phase out production is based on our principles of responsible environmental management."

126.   3M made no effort to notify communities in potentially affected areas of the risks associated with exposure to products that contained PFAS compounds.

127.   Under federal law, chemical manufacturers are required to immediately notify the EPA of information that reasonably supports the conclusion that one of their products presents a substantial risk of injury to health or the environment. *See* 15 U.S.C. § 2607(e) (hereinafter, "TSCA § 8(e)").

128.   3M, however, withheld from the EPA numerous scientific studies relating to the adverse health effects of PFAS—including studies from as early as the 1970s—until after 2000.

129.   Ultimately, the EPA required 3M to pay $1.5 million in penalties for TSCA § 8(e)

violations.

E.     **Wolverine's Fraudulent Concealment of the Toxic Nature of PFAS and the Presence of PFAS in Its Products**

130.     3M informed Wolverine in 1998, via a Material Safety Data Sheet, that PFOS was a component of Scotchgard, PFOS has the potential to accumulate in the human body with repeated exposure, and PFOS can resist degradation in the environment.

131.     In January of 1999, 3M informed Wolverine that 3M was working to reduce unnecessary human and environmental exposure to PFOS and invited Wolverine to assist in those efforts, which 3M described as the "prudent and responsible thing to do."

132.     As discussed above, in the early 2000s, pursuant to discussions with the EPA, 3M phased out PFOS and PFOA in its products, including Scotchgard.

133.     Wolverine—a significant 3M customer that heavily relied upon Scotchgard in its manufacturing process—was aware of 3M's phase-out decision, along with the reasons for the phase out.

134.     Despite knowledge of the harmful effects of PFAS chemicals and the need to limit human and environmental exposure to same, Wolverine failed to remediate any of its PFAS dump sites, failed to test and monitor for the presence of PFAS in the ground water, surface water, and well water in the community and failed to warn the residents of Kent County, including Plaintiffs and class members, that it had disposed of dangerous, bioaccumulating and persistent PFAS chemicals throughout the County, and that those chemicals could potentially contaminate residents' drinking water supplies.

135.     Moreover, and as detailed below, Wolverine repeatedly and affirmatively concealed the harmful nature of PFAS, and the presence of PFAS in their products, thus fraudulently concealing the existence of Plaintiffs' and class members' claims, as well as the

entities liable for the claims, *i.e.*, 3M and Wolverine.

136.    As described above, when the Kent County PFAS contamination first became public, Wolverine affirmatively concealed its liability by ghostwriting letters for the MDEQ to residents. These letters informed residents that PFAS had been detected in wells near their homes, asked residents for permission to sample their wells for PFAS, but failed to inform residents that the presence of PFAS in the wells was a result of Wolverine's negligent disposal practices. Indeed, the letter affirmatively misrepresented the source of the contamination by stating that PFAS is used in many products, including Teflon and Gortex, neither of which are manufactured by Wolverine.

137.    Despite this concealment, local media began to draw connections between the contamination and Wolverine.

138.    When local media reached out to Wolverine for comment, however, the company repeatedly lied, claiming that it did not know PFAS was used in Scotchgard until the fall of 2016. In one emailed statement, Wolverine said: "[i]n fall 2016, Wolverine *first learned* that PFOS may have been present in compounds used at its former tannery in Rockford."

139.    But this was not the first time Wolverine lied to the public about its use and disposal of PFAS throughout Kent County. According to local media reports, on August 22, 2016, prior to the public's discovery of Wolverine's unlawful PFAS dumping, Wolverine and a consultant met with a group of concerned citizens and told the citizens that there was no evidence that PFAS was ever used at the company's tannery.

140.    In reality, in June of 1999, months after 3M informed Wolverine that PFOS was a component of Scotchgard and advised Wolverine to take steps to limit human exposure to PFOS, a plumbing malfunction at Wolverine's tannery caused Scotchgard to mix directly into the water used for the tannery's drinking fountains. As a result, several employees became ill. Thus, no

later than this event—and likely much earlier—Wolverine had actual knowledge of the harmful effects of PFAS chemicals and the need to limit human and environmental exposure to the same.

141.    When employees complained, Wolverine repeatedly lied to them, telling them the water was safe.  The company eventually remediated the issue, but continued to lie to its employees, telling them they faced no "long-term risks" from drinking the water.

142.    Because of Wolverine's lies and misrepresentations, the severity of the contamination of the tannery's water supply did not become public until March 7, 2018, when Wolverine finally admitted to the contamination in a local news story.

143.    Wolverine fraudulently concealed the existence of Plaintiffs' and class members' claims, and Wolverine's liability for same.

144.    Plaintiffs and class members justifiably did not discover the causes of action they have against Defendants until water test results received in 2017 revealed that their wells are contaminated with PFAS.

## CLASS ACTION ALLEGATIONS

145.    The preceding paragraphs are incorporated by reference as if fully set forth at length herein.

146.    Plaintiffs bring this action as a class action pursuant to MCR 3.501 on behalf of themselves and a class of all other persons similarly situated as members of the  proposed class.

147.    Plaintiffs propose to represent the following class (collectively referred to within this Complaint as the "Class" or "Class Members"):

> All individuals who are or were owners of real property located in Kent County, who obtain or obtained their water supply from residential wells which have been found to contain PFOA and/or PFOS.

22

148.    This Class may, at a later date or at such time as this Honorable Court directs, be subdivided into smaller subclasses based upon the harm created by each specific Wolverine PFAS dump site.

149.    Excluded from the Class are: (a) Defendants and any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) the attorneys representing any parties to this Class Action; (d) any State or any of its agencies; and (e) the cities, towns, counties, townships, municipalities, and government entities of Kent County.

150.    The Class satisfies the criteria of MCR 3.501(A)(1) and (2).

**A.    Numerosity**

151.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The MDEQ is investigating or has already investigated over 90 areas of possible dumping activities, thus extending into communities with hundreds of private homes. The Class set forth above is sufficiently numerous to warrant class treatment and the disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

152.    Further, Class Members will be readily identifiable from publicly available information regarding property ownership and/or residential history.

**B.    Typicality and Commonality**

153.    Plaintiffs' claims are typical of the claims of the Class, as all are based on the same legal and remedial theories arising from exposure to toxic PFAS chemicals and to diminution in property value and/or nuisance from the actions of Defendants. Each Plaintiff has well water contaminated with PFAS.

23

154.    All members of the Class are similarly affected by Defendants' conduct resulting in injury to all members of the Class by causing them diminished property values and loss of the use and enjoyment of their properties.

155.    The factual basis of Defendants' misconduct is common to all Class Members and represents a common thread of misconduct resulting in injury to all members of the Class.

### C.    *Predominance of Common Questions*

156.    There are questions of law and fact which are common to all Class Members, which questions predominate over any question affecting only individual Class Members. The answers to these common questions will advance resolution of the litigation as to all Class Members.  The common legal and factual issues include:

   a.   Whether Defendants owed a duty to Plaintiffs and the Members of the Class to refrain  from conduct reasonably likely to cause contamination of Class Members'  well water;

   b.   Whether Defendants breached that duty;

   c.   Whether Defendants knew or should have known that it was unreasonably dangerous to dispose of and dump PFAS-containing waste into the environment;

   d.   Whether Defendants knew or should have known that disposing of PFAS-containing waste in the manner alleged herein was reasonably likely to cause contamination of the Class Members' well water;

   e.   Whether Defendants breached a legal duty to Class Members by disposing of PFAS-containing waste in the manner alleged herein;

   f.   Whether Defendants' breach of a legal duty caused Class Members' well water

24

to become contaminated with PFAS and other hazardous substances;

g.  Whether Defendants knew or should have known that Scotchgard contained toxic, persistent, mobile, and hazardous chemicals that were likely to contaminate the environment, groundwater and drinking water;

h.  Whether Defendants' contamination of the environment and water in Kent County, Michigan, including Class Members' private wells, caused the devaluation of the Class Member's property;

i.  Whether Defendants negligently or intentionally exposed Plaintiffs and the Class Members to hazardous PFAS chemicals;

j.  Whether Defendants became aware of the imminent environmental threat posed by Scotchgard and failed to warn Plaintiffs and the Class Members, failed to notify authorities, and failed to take appropriate remedial action; and

k.  Whether Plaintiffs and the Class Members have suffered damages as a result of Defendants' actions.

### D.   *Adequate Representation*

157.   Plaintiffs will fairly and adequately protect the interests of all Class Members in the prosecution of this action and in the administration of all matters relating to claims stated herein. Plaintiffs are similarly situated with, and have suffered similar, if not identical, injuries as the members of the Class who Plaintiffs seek to represent.

158.   Plaintiffs have retained counsel with substantial experience litigating both environmental torts and class action lawsuits such as this one.

159.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, have the resources to do so, and do not have any interest, conflicting or otherwise, adverse to the Class.

25

### E.  Superiority

160.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

161.    Absent a class action, some of the Class Members would likely find the cost of litigating to be prohibitively high and, therefore, would have no effective remedy at law, and the expense and burden of individual litigation would render it impossible for members of the Class to individually redress the wrongs done to them.

162.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

163.    There will be no difficulty in the management of this action as a class action and many examples of similar cases certified as class actions are readily available.

164.    The prosecution of separate actions by individual Class Members raises the likelihood of a risk of (i) inconsistent or varying adjudications with respect to individual members of the Class that would confront the party opposing the Class with incompatible standards of conduct; or (ii) adjudications with respect to individual members of the Class that would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

165.    Final equitable or declaratory relief might be appropriate with respect to the Class, in as much as remediation is a common remedy in contamination cases like this one.

166.    Proper and sufficient notice of this action may be provided to the Class Members through the mail, notice published in appropriate publications and/or broadcast in appropriate media, and/or posted on Defendants' internet web site(s).

167.    Plaintiffs and the members of the Class have suffered damages as a result of

Defendants' wrongful conduct as alleged herein, and are entitled to recover for those damages. Absent representative action, Plaintiffs and the Class Members will continue to suffer losses, thereby allowing these violations of law to proceed without remedy.

## CAUSES OF ACTION

### Count I – Negligence
### Against All Defendants

168.  Plaintiffs and Class Members incorporate the preceding paragraphs by reference as if fully set forth at length herein.

169.  Defendants knew or should have known that the use, discharge, disposal and presence of PFAS into the air, ground and waterways was hazardous to human health and the environment and required Defendants to take adequate safety precautions to ensure that PFAS was not released into the surrounding environment.  Where released into the environment, Defendants knew or should have known that PFAS contamination should have been remediated.

170.  Defendants knew or should have known that the use, dumping and disposal of waste-containing PFAS was unsafe and/or unreasonably dangerous.

171.  Defendants knew or should have known that Scotchgard is dangerous to human health and that its components cause or contribute to serious adverse health conditions.

172.  Defendants Wolverine and 3M owed Plaintiffs and Class Members duties to:

    a.  take all reasonable measures to ensure PFAS chemicals would be effectively contained and not discharged into the surrounding environment;

    b.  warn Plaintiffs of the dangers that PFAS chemicals pose to the environment and human health;

    c.  instruct, promulgate rules and guidelines, and train their personnel on the use, handling and disposal of Scotchgard and all materials treated with Scotchgard to ensure that Plaintiffs, and the environment, would not be exposed to and contaminated by hazardous PFAS chemicals;

    d.   ensure that the manufacturing and disposal processes Defendants used did not unreasonably endanger Plaintiffs' drinking water supply;

    e.   take all reasonable measures to ensure that PFAS and Scotchgard waste would be effectively contained and not discharged into the surrounding environment;

    f.   properly maintain and properly dispose of their toxic waste;

    g.   disclose the toxic nature of their products and the waste they were disposing, dumping and maintaining; and

    h.   properly remediate where release into the environment occurred.

173.    Defendants Wolverine and 3M breached their duties by producing products that were toxic to the environment and human health without properly, and indeed unreasonably, wrongfully and unlawfully, disposing of those products and by-products, including PFAS and products treated with Scotchgard, in a manner that would likely contaminate the environment, including the groundwater and air, with PFAS.

174.    Defendants Wolverine and 3M further breached their duties by failing to warn Plaintiffs of the dangers PFAS chemicals pose to the environment and human health, failing to disclose the toxic nature of their products and the waste they were disposing, dumping and maintaining, and failing to properly remediate the soil and groundwater where release into the environment occurred.

175.    As a result of Defendants' breaches, Plaintiffs' and Class Members' well water is contaminated with unsafe levels of PFOS and PFOA, and potentially other hazardous substances.

176.    These unsafe levels of PFAS have deprived, and continue to deprive, Plaintiffs and Class Members of potable water, reduced Plaintiffs' and Class Members' property values, caused Plaintiffs and Class Members significant annoyance and inconvenience, and destroyed their ability to use and enjoy their properties.

177.    Through their negligent, reckless and/or intentional conduct, Defendants

28

contaminated Plaintiffs' and Class Members' well water.

178.    If Defendants had not breached their duties owned to Plaintiffs and Class Members, Plaintiffs' and Class Members' water supply would not have been contaminated.

179.    The harm caused by Defendants' conduct was reasonably foreseeable.

180.    As a direct and proximate result of Defendants' breaches, Plaintiffs and Class Members have suffered injuries and damages, including, but not limited to, loss of the use and enjoyment of their properties, diminution in the values of their properties, monetary damages associated with the monitoring and remediation of their water supplies, and compensatory and consequential damages as set forth below.

### Count II – Private Nuisance
### Against Defendant Wolverine

181.    Plaintiffs and Class Members incorporate the preceding paragraphs by reference as if fully set forth at length herein.

182.    Defendant Wolverine, through its negligent, reckless and/or intentional and unreasonable acts and omissions alleged herein, has contaminated Plaintiffs' and Class Members' well water.

183.    Wolverine exercised sufficient ownership and/or control over its facilities and dump sites that it could have prevented the injuries suffered by Plaintiffs and Class Members.

184.    Through Wolverine's control over the operation of its facilities, handling and disposal of its toxic waste, and the maintenance of its toxic waste disposal sites, Wolverine released toxic substances, including PFAS, into the environment. These toxic substances, including PFAS, eventually migrated and contaminated Plaintiffs' and Class Members' residential wells.

185.    These toxic substances are invasive and have substantially interfered with Plaintiffs' and Class Members' use and enjoyment of their properties, reduced their property

29

values, and caused them to suffer monetary damages associated with monitoring and remediation of their water supplies.

186. Wolverine, aware of the adverse effects of these chemicals, had a duty to prevent the discharge of toxic chemicals into the environment, as well as to prevent the toxic chemicals from escaping from the disposal sites into Plaintiffs' and Class Members' well water.

187. Wolverine owed a duty to take all reasonable and necessary care to prevent Plaintiffs' and Class Members' water wells from becoming contaminated with dangerous PFAS chemicals.

188. Neither Plaintiffs nor Class Members consented to the invasion of toxic chemicals into their well water.

189. Plaintiffs and Class Members have property rights and privileges with respect to the use and enjoyment of their properties, including, but not limited to, the water wells on their properties and a right to well water that is not contaminated with harmful chemicals and substances.

190. Wolverine owed a duty to proceed with all reasonable and necessary care to prevent Plaintiffs' and Class Members' well water from becoming contaminated with dangerous PFAS chemicals.

191. The wrongful actions of Wolverine in causing PFAS chemicals to contaminate Plaintiffs' and Class Members' well water, and failure to disclose the presence thereof, created a substantial interference with the use and enjoyment of, and physical harm to, Plaintiffs' and Class Members' properties.

192. The contamination of Plaintiffs' and Class Members' well water has interfered with their right to use and enjoy their properties. Indeed, this interference is substantial in nature and

has caused significant harm. It has caused Plaintiffs and Class Members to, *inter alia*, refrain from using water to drink, cook, bathe, and all other household purposes, which has, in turn, caused significant inconvenience and expense. Wolverine's interference with the physical condition of the Plaintiffs' and Class Members' properties has created a disturbance in the comfort and/or conveniences of the properties' occupants, including their peace of mind and threat of future injury that is a present menace and interference with enjoyment.

193. Wolverine's conduct has also substantially interfered with Plaintiffs' and Class Members' ability to avail themselves of their properties' value as an asset and/or source of collateral for financing, and to use their properties in the manner that Plaintiffs and Class Members so choose.

194. Wolverine's negligent, reckless and/or intentional acts and omissions and interference with Plaintiffs' and Class Members' use and enjoyment of their properties were and continue to be substantial and unreasonable.

195. Wolverine's substantial and unreasonable interference with Plaintiffs' and Class Members' use and enjoyment of their properties constitutes a nuisance for which Wolverine is liable.

<u>**Count III – Public Nuisance**</u>
**Against Defendant Wolverine**

196. Plaintiffs and Class Members incorporate the preceding paragraphs by reference as if fully set forth at length herein.

197. Through Wolverine's negligent, reckless and/or intentional conduct described above, it has contaminated both the public land, waterways and drinking water of private wells in Kent County, Michigan.

31

198.    Wolverine's conduct unreasonably interfered with common rights enjoyed by the general public, specifically common rights and privileges with respect to the use and enjoyment of property, and access to safe, potable water.

199.    Wolverine's conduct, as described above, significantly interferes with public health, safety, peace, comfort, and convenience, as it has caused PFAS and other dangerous toxins to enter water supplies within Kent County.

200.    Wolverine's conduct, as the company knew or should have known, had a significant effect upon the public right, as it produced the permanent and long-lasting effect of causing PFAS and other dangerous toxins to enter water supplies within Kent County.

201.    Wolverine exercised sufficient ownership and/or control over its facilities and dump sites that it could have prevented the injuries suffered by Plaintiffs and the Class.

202.    Through its control over the operation of its facilities, the disposal of its toxic waste, and the maintenance of its toxic waste disposal sites, Wolverine discharged hazardous chemicals and toxic substances into the environment, including water supplies within Kent County.

203.    Wolverine's substantial and unreasonable interference with common rights enjoyed by the general public constitutes a nuisance for which it is liable.

204.    Neither Plaintiffs nor the Class consented to the invasion of toxic chemicals into their well water.

205.    Plaintiffs and the Class have a right to the use and enjoyment of their property, including but not limited to, their private water well, and a right to well water that is not contaminated with harmful chemicals and substances.

206.    The right to use and enjoy one's property is a right common to the general public.

207.    The right to well water that is not contaminated with harmful chemicals and

32

substances is a right common to the general public.

208.    Plaintiffs and the Class have suffered a harm that is different in kind from others similarly situated within the general public, as Plaintiffs' and Class Members' wells are contaminated with PFAS.

## **PRAYER FOR RELIEF**

As a result of the aforementioned acts and omissions of Defendants, Plaintiffs and Class Members seek relief including, but not limited to:

a.    Monetary damages for each violation of Counts I through III:

  i.   sufficient to remediate Plaintiffs' and Class Members' properties from the contamination caused by Defendants' conduct;

  ii.  to compensate Plaintiffs and Class Members for the diminution in the value of their properties caused by Defendants' conduct;

  iii. to compensate Plaintiffs and Class Members for the loss of use and enjoyment of their properties caused by Defendants' conduct;

  iv.  to compensate Plaintiffs and Class Members for the increased cost to obtain potable water, including the costs of alternative potable water sources or the installation and maintenance of an adequate filtration system; and

  v.   for such other monetary damages that are required to fully compensate Plaintiffs and Class Members for the loss of value, use, and enjoyment of their properties caused by Defendants' conduct.

b.    Plaintiffs and Class Members seek injunctive relief, including but not limited to, an order requiring Defendants:

  i.   to fully remediate Plaintiffs' and Class Members' properties so that Plaintiffs' and Class Members' properties are free from the presence of PFAS, and to provide Plaintiffs and Class Members with alternative, comparable housing during the remediation period;

  ii.  mandatory ongoing testing for PFAS and other chemical substances in Plaintiffs' and the Class's water supplies, and ongoing remediation of those substances as necessary; and

33

      iii.    to provide access to alternative water supplies.

c.    An order certifying the proposed Class; designating Plaintiffs as the named representatives of the respective Class Members; and appointing their counsel as Class Counsel;

d.    An order estopping Defendants from raising any and all defenses pertaining to the timeliness of Plaintiffs' and the Class' claims;

e.    An award to Plaintiffs and Class Members of compensatory, exemplary, and consequential damages, including interest in an amount to be proven at trial;

f.    An award of attorneys' fees and costs;

g.    An award of pre-judgment and post-judgment interest as provided by law; and

h.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs and Class Members demand a jury on all issues triable by a jury set forth in this Second Amended Class Action Complaint.

Dated:  October 3, 2018

Jason J. Thompson (P47184)
SOMMERS SCHWARTZ, P.C.
Attorneys for Plaintiffs
One Towne Square, 17th Floor
Southfield, MI  48076
(248) 355-0300

Esther Berezofsky (P00148)
Sarah Hansel (P00152)
Berezofsky Law Group, LLC
210 Lake Drive East, Ste. 101
Cherry Hill, NJ 08002
(856) 667-0500

34

Anne McGinness Kearse [*Pro Hac Vice*]
Thomas David Hoyle [*Pro Hac Vice*]
Fidelma L. Fitzpatrick [*Pro Hac Vice]*
Motley Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9140

Wexler Wallace, LLP
Edward A. Wallace [*Pro Hac Vice*]
Bryan D. Pasciak [*Pro Hac Vice*]
Kara A. Elgersma [*Pro Hac Vice*]
55 W. Monroe St., Ste. 3300
Chicago, IL  60603
(312) 346-2222

Pitt, McGehee, Palmer & Rivers, PC
Robert Palmer (P31704)
Megan A. Bonanni (P52079)
Jennifer L. Lord (P46912)
117 West 4th Street, Ste. 200
Royal Oak, MI  48067
(248) 398-9800

Wexler Wallace, LLP
Edward A. Wallace [*Pro Hac Vice*]
Bryan D. Pasciak [*Pro Hac Vice*]
Kara A. Elgersma [*Pro Hac Vice*]
Attorneys for Plaintiffs
55 W. Monroe St., Ste. 3300
Chicago, IL  60603
(312) 346-2222

Pitt, McGehee, Palmer & Rivers, PC
Robert Palmer (P31704)
Megan A. Bonanni (P52079)
Jennifer L. Lord (P46912)
Attorneys for Plaintiffs
117 West 4th Street, Ste. 200
Royal Oak, MI  48067
(248) 398-9800

Motley Rice, LLC
Anne McGinness Kearse [*Pro Hac Vice*]
Thomas David Hoyle [*Pro Hac Vice*]
Fidelma L. Fitzpatrick [*Pro Hac Vice*]
Attorneys for Plaintiffs
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000

WARNER NORCROSS & JUDD LLP
James Moskal (P41885)
Janet Ramsey (P63285)
Madelaine C. Lane (P71294)
R. Michael Azzi (P74508)
Thomas A. Amon (P74508)
Attorneys for Defendant
111 Lyon, N.W., Ste. 900
Grand Rapids, MI 49503
(616) 752-2000

## PROOF OF SERVICE

The undersigned certifies that on October 3, 2018, she served a copy of Plaintiffs' Second Amended Complaint upon all parties to the above cause, at the attorneys respective addresses listed below by regular first class mail:

Warner Norcross & Judd, LLP
James Moskal
Janet Ramsey
Madelaine C. Lane
R. Michael Azzi
Thomas A. Amon
111 Lyon, NW, Ste. 900
Grand Rapids, MI  49503

Wendy Vaughn
Sommers Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, MI  48076
(248) 355-0300